# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AGRICOLA BAJA BEST, S. De. R.L.
de C.V., a business entity organized
under the laws of the Republic of
Mexico,

                                    Plaintiff,

        vs.

HARRIS MORAN SEED
COMPANY, a California Corporation,

                                    Defendant.

CASE NO. 11CV2482 BEN (JMA)

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS
FOR SUMMARY JUDGMENT**

[Docket Nos. 51, 52]

        The parties have each filed a motion for summary judgment.  Plaintiff Agricola
Baja Best ("Baja Best") moves for a determination that Defendant Harris Moran Seed
Company ("Harris Moran") is the seller of the seeds at issue in this case, that Harris
Moran's warranty disclaimers and limitations of liability are unenforceable, and for
summary judgment on six Harris Moran affirmative defenses. (Docket No. 51.)  Harris
Moran moves for summary judgment on each of Baja Best's eight claims. (Docket No.
52.)  For the reasons stated below, the Motions are **GRANTED** in part and **DENIED**
in part.
///

- 1 -

11cv2482

**BACKGROUND**

**I.    Associated Entities**

Three entities are involved in this action, although only Baja Best and Harris Moran are parties.

**A.    Plaintiff Baja Best**

Baja Best is a commercial agricultural grower of tomatoes located in Baja, California, Mexico. (Ybarguen Decl. ¶ 2.)[1]  Baja Best is located in the Vizcaino area of Baja California. (*Id.*)  Baja Best purchased the seeds that are at issue in this action. (*Id.*)

**B.    Defendant Harris Moran**

Harris Moran is an American company with its principal place of business in California. (Def.'s Mot., Decl. of Michael Sheets ("Sheets Decl.") ¶ 3.)  Harris Moran manufactures and sells seeds to third-party seed distributors and commercial growers around the world. (*Id.*)

**C.    Semillas Harris Moran Mexicana SA de CV**

Semillas is not a party to this action.  Semillas Harris Moran Mexicana SA de CV ("Semillas") is a Mexican entity with its principal place of business in Mexico. (*Id.*)  Semillas is a wholly owned subsidiary of Harris Moran and is one of four Mexican distributors through which Harris Moran sold seed during the time Baja Best purchased seeds. (*Id.*; Def.'s Opp'n, Supp. Decl. of Michael Sheets ("Sheets Supp. Decl.") ¶ 4.)  Semillas purchases seed from Harris Moran for its own inventory, generally in large quantities, and often before Semillas has arranged subsequent sales to its customers. (Def.'s Opp'n, Decl. of Nicolas Tinel ("Tinel Decl.") ¶ 5.)  Semillas determines what price to charge its customers and distributors. (*Id.* ¶ 4.)  Some Semillas customer complaints are directed to Harris Moran. (Sheets Decl. ¶ 5.)

---

[1]Two declarations from Manuel Ybarguen are relied on by the Court.  Those declarations are identified as follows:
- Pl.'s Opp'n, Decl. of Manuel Ybarguen ("Ybarguen Decl.")
- Def.'s Mot., Decl. of Manuel Ybarguen in Supp. of Pl.'s Mot. to Amend ("Ybarguen Decl. on Amd.")

**II.    Seed Orders**

    **A.    Communications Between Baja Best and Machado**

       In 2009, Manuel Ybarguen, with Baja Best, contacted a sales representative for Semillas, Jorge Machado, to discuss acquiring tomato seeds with resistance to Tomato Spotted Wilt Virus ("TSWV").  (Def.'s Mot., Decl. of Brian K. Tomkiel ("Tomkiel Decl."), Ex. 2 ("Ybarguen Dep.") 66:9-25.)  When Machado met with Ybarguen to discuss acquiring seeds, Machado wore a shirt and hat with Harris Moran's logo, drove a car with Harris Moran's logo on its side, and had a business card with Harris Moran's logo on it.  (Ybarguen Decl. ¶ 8; Tomkiel Supp. Decl. ¶ 4, Ex. 3 [Machado Business Card].) However, this business card also lists Machado's employer as "Semillas Harris Moran Mexicana S.A. de C.V."  (*Id.*)

       Machado recommended the Moctezuma seed because it was "armored" against diseases, including TSWV.  (Pl.'s Opp'n, Decl. of Mario Soto ("Soto Decl.") ¶ 15.) Prior to deciding which seeds to purchase for its 2010 crop cycle, Mario Soto, Baja Best's production manager overseeing tomato crop production at the time, reviewed a 2009 article advertising Espartaco and Moctezuma seed as being resistant to TSWV in an agricultural magazine entitled *Productores de Hortilizas*.  (Tomkiel Decl., Ex. 9 ("Soto Dep.") 83:10-84:1, 91:8-94:2.)

    **B.    Levels of Resistance**

       As alleged by Baja Best in the FAC, Harris Moran identifies four different levels of resistance of plant varieties to pest or pathogen infection: 1) Immunity ("I"); Resistance ("R"); Intermediate Resistance ("IR"); and Susceptible ("S"). The four levels are defined as follows:

> **Immunity.**  Plant varieties which are not subject to attack or infection by a specific pest/pathogen are considered immune.
> **Resistance.**  Not as strong as immunity; two levels of resistance of defined.
>> **Resistance (R):** plant varieties that restrict the growth and development of the specific pest or pathogen under normal pest or pathogen attack when compared to susceptible

- 3 -

varieties. These plant varieties can exhibit some symptoms or damage under heavy pest or pathogen pressure. Plant varieties with Resistance (R) are not immune to the pest/pathogen.

**Intermediate Resistance (IR):** plant varieties that restrict the growth and development of the specified pest/pathogen, but may exhibit a greater range of symptoms or damage compared to resistant varieties. Intermediate resistance plant varieties will usually show less severe symptoms or damage than susceptible plant varieties when grown under similar environmental conditions and/or pest/pathogen pressure, but may have heavy damage under heavy pressure. Plant varieties with Intermediate Resistance (IR) are not immune to the pest/pathogen.

**Susceptible** is defined as the inability of a plant variety to restrict the growth and development of a specified pest/pathogen. Plant varieties that are susceptible will show damage when infected and are more likely to have heavy damage under moderate levels of pest/pathogen pressure.

( FAC ¶¶ 8-9.)

### C.    Seed Trials

Machado provided samples of a number of different varieties of Harris Moran's seed. (Ybarguen Dep. 82:4-25.) Baja Best's personnel, including Soto, conducted a field trial on four of Harris Moran's seed varieties, Ramses, Cuauhtemoc, Espartaco, and Mectezuma, in addition to seeds from other companies. (Soto Dep. 62:8-63:4, 66:10-67:22, 68:11-69:3.) The Moctezuma, Espartaco, and Cuauhtemoc varieties did not show any problems with viral diseases during the trial. (*Id.* at 62:11-63:4, 66:13-67:22, 68:13-69:3.)

### D.    Seed Orders

Baja Best placed three total orders for Harris Moran seed with Semillas. The first, for Espartacto and Cuahtemoc seeds, was in late 2009; Moctezuma was unavailable. (Soto Dep. 78:11-14, 79:2-10, 80:13-81:3.; Ybarguen Dep. 103:2-12.) A second order, for Moctezuma seeds, was placed in 2010. (Soto Dep. 280:2-5,

11cv2482

287:23-288:6.)  These 2010 commercial crops were ultimately successful.  (Ybarguen Dep. 104:6-105:7.)

In late November 2010, Baja Best placed a third order with Semillas through Machado for the seed at issue in this action.  (Ybarguen Decl. ¶ 3.)  The order consisted of the Moctezuma and Espartaco varieties with a total cost of $90,177.00.  (*Id*. ¶ 3.)  Baja Best paid for the seeds prior to delivery.  (*Id.* ¶ 10.)

The invoices for all three orders contained both the name and company information for  Semillas and Harris Moran's logo.  (Ybarguen Decl. ¶ 9, Ex 2 [Copy of Invoice].)  A booklet containing warranty disclaimers and a limitation of liability were attached to the seed packets for all three orders.  (Sheets Decl. ¶ 6.)

### E.    Crop Treatment

By December 2010, the seeds at issue in this action were in Baja Best's possession and Baja Best began preparing the seeds for cultivation.  (Soto Dep. 215:1-218:23; 219:18-221:4.)  Baja Best's preparations included a hot water treatment process requiring the seed to soak in hot water maintained at a specific temperature for a specific period of time.  (Sheets Supp. Decl. ¶ 7.)  Semillas employee Christian Pulido witnessed Baja Best's personnel, Soto and Zoilo Haro, perform the hot water treatment upon the seed at issue. (Tomkiel Supp. Decl., Ex. 7 ("Haro Dep.") 75:17-25.)  Pulido informed Soto and Haro that the treatment would void any guarantees relating to the seed because Harris Moran would not take responsibility for any seed subjected to treatments other than those Harris Moran provided itself.  (Tomkiel Supp. Decl., Ex. 8 ("Pulido Dep.") 54:18-55:12; Soto Dep. 220:6-221:4.)

### F.    Crop

The crop showed signs of disease early on that spread rapidly.  (Ybarguen Decl. ¶ 19.)  In response to Baja Best's complaints about the crop, Machado and Pulido visited the fields numerous times between January 2011 and April 2011 and collected information about the crop.  (Pulido Dep. 71:2-12, 122:16-25.)  Samples were taken for testing, although the results of the testing were not provided to Baja Best.

(Ybarguen Decl. ¶ 20.)  Ultimately, Baja Best lost close to 90% of its 2011 tomato crop to TSWV.  (*Id.* ¶ 23.)  Baja Best alleges damages reaching approximately one million dollars.  (*Id.*)

Baja Best filed its First Amended Complaint against Harris Moran, alleging: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty of merchantability; (4) breach of implied warranty of fitness for a particular purpose; (5) products liability; (6) negligence; (7) negligent misrepresentation; and (8) fraud.[2]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "[W]hen the parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)  (internal quotation marks omitted).

A moving party bears the initial burden of showing there are no genuine issues of material fact.  *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir. 2007) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)).  The moving party can do so by negating an essential element of the non-moving party's case, or by showing that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317,

---

[2]Baja Best agreed to dismissal of its Negligent Misrepresentation and Fraud claims (Pl.'s Opp'n 3, n.2.)

1  331 (1986).  The burden then shifts to the non-moving party to show that there is a

2  genuine issue for trial.  *Horphag Research Ltd.,* 475 F.3d at 1035.

3     "Only disputes over facts that might affect the outcome of the suit under the

4  governing law will properly preclude the entry of summary judgment.  Factual disputes

5  that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  As

6  a general rule, the "mere existence of a scintilla of evidence" will be insufficient to

7  raise a genuine issue of material fact; there must be evidence on which the jury could

8  reasonably find for the non-moving party.  *Id.* at 252.  "Summary judgment procedure

9  is properly regarded not as a disfavored procedural shortcut, but rather as an integral

10  part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and

11  inexpensive determination of every action.'"  *Celotex Corp.,* 477 U.S. 327 (quoting

12  FED. R. CIV. P. 1).

13  **DISCUSSION**

14  **I.  Agency**

15     Baja Best seeks a determination that Semillas is Harris Moran's agent under

16  agency theory, making Harris Moran liable as if Harris Moran were the actual seller of

17  the seed.[3]  "The burden of proving agency . . . rests upon the party asserting the

18  existence thereof."  *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*,

19  870 F. Supp. 2d 881, 916 (C.D. Cal. 2012) (citing *Cal. Viking Sprinkler Co. v. Pac.

20  Indem. Co.*, 213 Cal. App. 2d 844, 850 (2d Dist. 1963)).  As the moving party with the

21  burden of proof on the issue, Baja Best "must affirmatively demonstrate that no

22  reasonable trier of fact could find other than for" it.  *Soremekun v. Thrifty Payless, Inc.*,

23  509 F.3d 978, 984 (9th Cir. 2007).

24     Harris Moran also raises this issue in its motion for summary judgment by

25  asserting that Semillas is not its agent and Harris Moran therefore cannot be liable as

26  _____

27     [3]Baja Best additionally requests the Court find that Harris Moran was the seller of the seed.  Baja Best provides no basis in fact or law for this finding.  It is undisputed that Harris Moran and Semillas are distinct corporate entities and Baja Best cites no

28  authority for the Court to simple decide Harris Moran was the actual seller of the seed under such circumstances.

the seller.  In this respect, Harris Moran is also the moving party on this issue and as the moving party "on an issue on which [Baja Best] bears the burden of proof," may meet its burden by "pointing out . . . that there is an absence of evidence to support [Baja Best's] case." *Celotex*, 477 U.S. at 325.

Because there are genuine issues of material fact in dispute, neither party is entitled to summary judgment on the issue of agency.

Generally, a parent corporation is not liable for the conduct of its subsidiaries. *See United States v. Best Foods*, 524 U.S. 51, 61 (1998) (collecting authority).  Only under unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary.  *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1238 (N.D. Cal. 2004).  However, if an agency relationship does exists between the parent and subsidiary, the parent may be liable for acts of the subsidiary.  *See id.* at 1235.  "Whether to hold a parent liable for the acts of its subsidiary is a highly fact-specific inquiry." *Id.*

In determining whether an agency relationship exists, "the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles.'" *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 541 (5th Dist. 2000).  "If a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent." *Id.*  This degree of control "must be over and above that to be expected as an incident of the parent's ownership of the subsidiary." *See id*. at 542.

In support of a finding that Semillas is Harris Moran's agent, Baja Best notes that the sales representative Baja Best dealt with, Machado, wore a shirt and hat with

1   Harris Moran's logo, drove a car with Harris Moran's logo, and had a business card

2   that included Harris Moran's logo.  (Ybarguen Decl. ¶ 8.)  Additionally, the invoices

3   and seed packets included Harris Moran's logo.  (*Id.* ¶ 9.)  While this evidence may

4   support Baja Best's agency argument, branding with a parent corporation's logo is,

5   alone, insufficient to establish an agency relationship.  *BBA Aviation PLC v. Superior*

6   *Court*, 190 Cal. App. 4th 421, 434-435 (2d Dist. 2010) (holding that the mere

7   appearance of a parent's logo on its subsidiary's signage, business cards, and

8   employment documents is insufficient to prove existence of an agency relationship).

9   It is particularly unpersuasive here because it is undisputed that Machado's business

10  card identified Semillas as his employer and the invoices that included the Harris

11  Moran logo identified Semillas more specifically, including an address and contact

12  phone numbers.  (Tomkiel Supp. Decl. ¶ 4; Ybarguen Decl., Ex. 1 [Invoice].)

13      Baja Best has also produced evidence that Harris Moran handles Semillas

14  customer complaints, Semillas sells only Harris Moran seed, and Semillas exists as a

15  convenience for Harris Moran to legally operate in Mexico.  (Sheets Decl. ¶ 5; Tinel

16  Decl. ¶ 5; Decl. of Adriana Gutierrez-Herrera ("Gutierrez-Herrera Decl."), Ex. 1

17  ("Sheets Dep.") 12:9-23.)  However, as Harris Moran notes, the evidence also reflects

18  that Harris Moran does not control the price Semillas sets for seed or which customers

19  Semillas sells its inventory to.  (Tinel Decl. ¶ 6.)

20      Given the evidence in dispute, the Court cannot find that an agency relationship

21  does or does not exist as a matter of law.  *See Sun Microsystems Inc. v. Hynix*

22  *Semiconductor Inc.*, 622 F. Supp. 2d 890, 901 (N.D. Cal. 2009) (finding that "it is

23  impossible for the court to conclude with certainty that all facts presented" cut

24  decisively against a finding of agency as a matter of law).  Because there are genuine

25  issues of material fact in dispute, the parties' motions for summary judgment are

26  **DENIED** on the issue of agency.

27  ///

28  ///

## II. Contract and Warranty Claims

Baja Best asserts claims for Breach of Contract, Breach of Express Warranty, Breach of Implied Warranty of Merchantability, and Breach of Implied Warranty of Fitness for a Particular Purpose.

Harris Moran argues it is entitled to summary judgment on Baja Best's breach of contract claim and warranty claims because Baja Best has not produced any evidence of a breach.[4]  More specifically, Harris Moran points to the absence of any evidence that the seeds were Susceptible, rather than having the Intermediate Resistance promised.

In addressing this argument, the Court must first consider two issues: (1) are Baja Best's expert's declarations inadmissable as sham declarations and (2) must Baja Best produce evidence the seeds lacked Intermediate Resistance or is evidence of a general lack of resistance sufficient.

### A. Expert Declarations

Harris Moran argues that Baja Best's experts' declarations are inadmissable because the declarations contradict prior deposition testimony.  Under the sham affidavit rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting *Van Arsdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)). Allowing such affidavits "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Kennedy v. Allied Mut. Ins. Co.*, 577 F.2d 262, 266 (9th Cir. 1991)).  However, invoking the rule too aggressively may "ensnare  parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Van*

---

[4]Harris Moran additionally argues Baja Best cannot prove breach of an oral contract or breach of an implied warranty against Harris Moran because Baja Best's contract discussions were with a Semillas employee, Machado, not Harris Moran.  As previously discussed, the Court cannot determine as a matter of law that Semillas was not Harris Moran's agent.

*Arsdale*, 577 F.3d at 998 (noting the "rule should be applied with caution"). To ensure appropriate application of the rule, the Ninth Circuit imposes two limitations. *Id.* First, the Court must "make a factual determination that the contradiction [is] actually a sham." *Id.* at 998. This limitation is intended to ensure the Court "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* (quoting *Kennedy*, 577 F.2d at 266-67.) Second, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous." *Id.* A declaration that "elaborates upon, explains, or clarifies prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy [or] a mistake . . . afford no basis for excluding an opposition affidavit." *Id.* at 999 (quoting *Messick v. Horizon Indus.*, 63 F.3d 1227, 1231 (9th Cir. 1995)).

### 1. Dr. Mikel Stevens Declaration

During Dr. Mikel Steven's deposition, he could not determine if a seed containing the Sw-5 gene that resisted in only some respects would meet the definition of Intermediate Resistance. (Tomkiel Decl., Ex. 18 ("Steven's Dep.") 162:5-18.) Dr. Stevens also indicated he did not have an opinion about whether the Esparatco seed met the definition of Intermediate Resistance. (*Id.* at 162:20-25.)

Dr. Stevens' declaration indicates he would not classify either seed "at issue in this case as having resistance or intermediate resistance, regardless of how it is defined." (Decl. of Dr. Mikel Stevens ("Stevens Decl.") ¶ 28.) He goes on to opine that "[t]he minimal resistance shown . . . may take them out of the category of Susceptible, as defined by Harris Moran, but it would not make them Intermediate Resistance or any kind of resistance." *Id.* He also opines that the seeds "largely failed to resist and should be categorized as susceptible." *Id.*

Dr. Steven's deposition testimony and declaration are inconsistent in that in his deposition, he did not have an opinion as to whether one of the seeds met the definition of Intermediate Resistance and in his declaration he opines that the seeds did not have

1   Intermediate Resistance.  Although this testimony is inconsistent, the inconsistency is

2   not "clear and unambiguous," but rather, when viewed in context is more in line with

3   an explanation of prior deposition testimony.  *Van Arsdale*, 577 F.3d at 998-99.

4        Dr. Stevens' refusal to indicate whether the seeds had Intermediate Resistance

5   came up in the context of Dr. Stevens explaining that he was not comfortable with

6   Harris Moran's classification of seed as Susceptible or having Intermediate Resistance

7   and counsel's clarification that Dr. Stevens' use of the terms susceptible, resistant, and

8   intermediate resistence during his deposition were in a general sense rather than the

9   specific terms used by seed manufacturers.  (Stevens' Dep. 161:7-162:4.)   The

10  testimony fluctuates between the concepts of susceptibility and resistance and Harris

11  Moran's definitions that are the basis for this action. (*Id.* at 161:7-162:25.) Dr. Stevens

12  is trying to avoid using definitions he finds inappropriate.  That view persists in his

13  declaration because he only classifies the seed as falling somewhere between

14  Susceptible and Intermediate Resistance, as defined by Harris Moran.  (Stevens Decl.

15  ¶ 28.)   His declaration does clarify that the seeds would not qualify as having

16  Intermediate Resistance, under any definition, but given that Dr. Stevens still fails to

17  put the seeds into any of the available Harris Moran classifications and the context of

18  the deposition testimony, the Court cannot find the declaration is a sham. *Van Arsdale*,

19  577 F.3d at 998.

20              **2. Dr. John Bahme Declaration**

21        Harris Moran also takes issue with Dr. Bahme's opinons and observations about

22  Dr. Steven's theory of "downstream" genetic makeup.  Harris Moran does not indicate

23  that Dr. Bahme's declaration contradicts any prior deposition testimony, rather, Harris

24  Moran notes that Dr. Bahme did not offer any observations or opinions on the theory

25  during his deposition, but agrees with the theory in his declaration. (Decl. of Dr. John

26  Bahme ("Bahme Decl.") ¶ 7.)   There is no inconsistency between Dr. Bahme's

27  declaration and his prior testimony because he did not offer any previous testimony on

28  the subject.

11cv2482

Harris Moran asks the Court to exclude Dr. Bahme's declaration under *Gates v. Caterpillar*, but it does not require exclusion of Dr. Bahme's declaration.  513 F.3d 680, 687-88 (7th Cir. 2008).  In *Gates*, the plaintiff in a sex discrimination case was questioned during her deposition about a conversation that occurred during an evaluation and did not mention a comment about gender inequality that was made during the conversation, but the comment was included in a later declaration.  *Id*.  The Seventh Circuit found "the *omission* of such a significant statement during her deposition in a sex discrimination case speaks volumes" and excluded the evidence. *Id.* at 688 (emphasis in original).  Here, Harris Moran notes the absence of prior testimony from Dr. Bahme on Dr. Stevens' theory, but does not indicate that he was previously questioned about it or that the subject was raised in some respect that would give any significance to the subject being addressed in his declaration.  The Court will not exclude Dr. Bahme's declaration on this basis.

**B. Alternate Theory of Liability**

Baja Best's FAC, the operative complaint in this action, alleges the seed at issue in this case did not have Intermediate Resistance to TSWV, but rather were Susceptible. (FAC ¶¶ 10, 13-15, 17, 21, 25, 28-32, 36-39, 41-42, 44, 47-49, 51-55, 58, 60, 63, 65-68, 70, 73, 75-83.) The upper-case "I," "R," and "S" are important because these terms are defined in detail in the FAC.  (FAC ¶¶ 7-9.)  Baja Best now attempts to alter its theory of liability on summary judgment, arguing liability is based on the seed generally lacking sufficient resistance.  This is essentially an attempt to amend the complaint through an opposition to summary judgment to assert a different theory of liability.  Such a late attempt to amend is not viewed favorably.  *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398-99 (9th Cir. 1986) (noting "late amendments to assert new theories are not reviewed favorably" and affirming the district court's denial of leave to amend); *Roberts v. Ariz. Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (affirming district court's denial of leave to amend "after discovery was complete and the [defendant's] motion for summary judgment was

1  pending"); *see also Stations W., LLC v. Pinnacle Bank of Or.*, 338 F. App'x. 658, 660

2  (9th Cir. 2009).  Baja Best may not alter its theory of liability at this late stage.[5]

3              **1. Susceptible or Intermediate Resistance**

4          Harris Moran argues that it is entitled to summary judgment on Baja Best's

5  breach of contract and warranty claims because Baja Best lacks evidence that the seeds

6  were Susceptible.  Although this is accurate, Baja Best's claims are also based on the

7  seeds not having Intermediate Resistance, as defined by Harris Moran.  Harris Moran

8  argues Intermediate Resistance is defined as the alternative to Susceptibility and there

9  is no middle ground.  Although the definition indicates seeds with Intermediate

10  Resistance "will usually show less severe symptoms or damage than suceptible plant

11  varieties," Intermediate Resistance is also defined as a variety "that restrict[s] the

12  growth and development of the specified pest/pathogen."  (FAC ¶ 9.)

13         Baja Best has put forth evidence that the seeds did not have Intermediate

14  Resistance to TSWV, including expert testimony that the seeds did not have

15  Intermediate Resistance and that a 90% crop loss is significantly greater than to be

16  expected from seeds with Intermediate Resistance.  (Stevens Decl. ¶¶ 21, 28; Bahme

17  Decl. ¶¶ 8-10.)  There is certainly contrary evidence, including that the seeds had the

18  Sw-5 gene that is generally considered to be a resistance-conveying gene and that 10%

19  of the crop survived.  (Stevens Decl.¶¶ 5, 17; Bahme Decl. ¶¶ 9-10.)  However, at this

20  stage, the Court cannot weigh the evidence.  *Anderson*, 477 U.S. at 255.  Because

21  genuine issues of material fact preclude summary judgment on the contract and

22  warranty claims, Harris Moran's motion for summary judgment on these claims is

23  **DENIED**.

24  ///

25

26        [5]The Court, albeit a previous Judge handling this case, denied leave to amend to
make the changes Baja Best now attempts to make through summary judgment, in
27  addition to other amendments, due to Baja Best's lack of reasonable diligence. (Pl.'s
Mot. for Leave to File Second Amended Compl. (Docket No. 40), Proposed Second
28  Amended Compl. (Docket No. 40-3); Judge Gonzales' Order Denying Pl.'s Motion for
Leave to File Second Amended Compl. (Docket No. 48.))

### III.   Products Liability and Negligence

Harris Moran moves for summary judgment on Baja Best's claims for products liability and negligence based on the economic loss rule.[6]  Under the economic loss rule, "a purchaser must recover in *contract* for purely economic loss due to disappointed expectations." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (emphasis added).  "Economic loss consists of damages for inadequate value, costs of repair, and replacement of the defective product or consequent loss of profits – without any claim of . . . damage[] to other property." *Id.* (quoting *Jimenez v. Superior Court*, 29 Cal. 4th 473, 482 (2002)).  Tort recovery is available if the defective product damages "property other than the defective product itself." *KB Home v. Superior Court*, 112 Cal. App. 4th 1076, 1079 (2d Dist. 2003).  Recovery in tort is barred unless the purchaser "can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter*, 34 Cal. 4th at 988.  The rule "prevents the law of contract and the law of tort from dissolving one into the other." *Id.*; *see also KB Home*, 112 Cal. App. 4th at 1079 (explaining that the rule allows recovery "in strict products liability in tort when a product defect causes damage to . . . property other than the product itself," but "the law of contractual warranty governs damage to the product itself").

The parties arguments focus on whether the tomato seed and the resulting tomato plant are the same product.  If the same product, Baja Best's products liability and negligence claims are barred by the economic loss rule.  If the tomato seed and resulting tomato plant are different products, Baja Best's products liability and negligence claims may proceed.  Harris Moran argues the seed and plant are the same

---

[6]Both parties acknowledge Judge Gonzalez's prior decision ruling on a motion to dismiss in this case and Baja Best invokes it as binding under the law of the case doctrine, without citation to authority or analysis.  The Court notes that Judge Gonzalez's determination that this issue was not appropriate for determination on a motion to dismiss does not bind this Court's decisions on summary judgment based on the law of the case doctrine. *See Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) (noting the differences between the standards applicable at different stages of litigation and finding that pre-trial rulings "don't bind district judges for the remainder of the case").

1    product.  Baja Best argues the seed and resulting tomato plant are not the same product

2    and that a jury must decide whether a tomato seed and a tomato plant are the same

3    product.  There are no facts in dispute on this issue that preclude summary judgment.[7]

4    The parties agree that a tomato plant grows from a tomato seed with the benefit of soil,

5    water, and other efforts of the grower.

6         Based on the undisputed facts, the Court finds that Baja Best's claims for

7    products liability and negligence are barred by the economic loss rule for two reasons.

8    One, the tomato seed and resulting tomato plant are the same product.  Two, there is

9    no evidence of harm beyond a broken contractual promise, an issue governed by

10   contact law.  *Robinson Helicopter*, 34 Cal. 4th at 988.

11        Baja Best characterizes the connection between the tomato seed and tomato plant

12   as nothing more than a "relationship" between two distinct products, akin to a defective

13   window in a house.  (Pl.'s Opp'n 15-16 (citing *Jimenez*, 29 Cal. 4th at 483-84).)

14   However, unlike a house damaged by a defective window or a furnace damaged by a

15   defective furnace component, a tomato plant cannot exist independent of the tomato

16   seed.[8]  It may be obvious that "a tomato comes from a seed that grows," but this

17   undisputed and unique fact distinguishes this case from those cited by Baja Best and

18   every other case addressing the economic loss rule.  (Def.'s Mot. 19; Pl.'s Opp'n 15.)

19   A window does not grow into a house.  Other inputs, *i.e.* soil, water, fertilizer, and

20   various chemicals, may also be necessary to grow a tomato plant, but seed is more than

---

[7]In *KB Home v. Superior Court*, the court found that "determining what the product at issue is . . . should be left to the trier of fact."  112 Cal. App. 4th at 1087. However, in *KB Home*, there were factual disputes relevant to identifying the defective product, including the significance of the defective component in a furnace, how the component was purchased, and how easily the component could be removed from the furnace.  *Id.* at 1086-87.  In this case, there are no similar factual disputes about what the allegedly defective product is, it is the tomato seed.

[8]In *Jimenez v. Superior Court*, the court found the economic loss rule did not bar a products liability claim against the manufacturer of a defective window installed in a house when the defect caused damage to the house. 29 Cal. 4th at 483-84. Similarly, in *KB Home v. Superior Court*, the court found claims for negligence and products liability were not necessarily barred by the economic loss rule when one component of a furnace allegedly damaged other components of the furnace.  112 Cal. App. 4th at 1086-86.

1     an input because the seed becomes the plant.  Based on the undisputed evidence, there

2     is no damage to "property other than the product itself" because the tomato seed and

3     tomato plant are the same product.  *See KB Home*, 112 Cal. App. 4th at 1079.

4         Additionally, Baja Best has not "demonstrate[d] harm above and beyond a

5     broken contractual promise."  *Robinson*, 34 Cal. 4th at 988.  Baja Best has produced

6     evidence the seed it purchased from Semillas lacked the Intermediate Resistance

7     promised and this defect in the seed caused the tomato crop to fail.  However, "[w]here

8     a purchaser's expectations in a sale are frustrated because the product he bought is not

9     working properly, his remedy is said to be in contract alone, for he has suffered only

10    economic losses."  *Id.*  (explaining the economic loss rule and emphasizing the

11    distinction drawn between contract and tort law).

12        Harris Moran's motion for summary judgment on Baja Best's negligence and

13    products liability claims based on the economic loss rule is **GRANTED**.

14 **IV.   Limitation of Warranty and Liability**

15        Both parties move for summary judgment on the Limitation of Warranty and

16    Liability and Use Restriction ("LOL").  Baja Best moves for summary judgment

17    seeking a determination that it is not bound by any of the terms because the LOL were

18    not provided before the seed was delivered, the LOL are unconscionable, and the LOL

19    violate public policy.  Harris Moran asks the Court to find the LOL enforceable.

20        Neither party identifies any genuine issues of material fact that preclude

21    summary judgment on this issue.  Manuel Ybarguen negotiated the seed sale on behalf

22    of Baja Best with Semillas' Jorge Machado.  (Ybarguen Dep. 66:9-25.)  Discussions

23    about the purchase were by phone and in person and the seed order was placed via

24    phone. (Ybarguen Decl. ¶ 4.)  The LOL were attached to the seed packets for the sale

25    at issue in this action and for two prior seed orders in 2009 and 2010.  (Sheets Decl. ¶¶

26    4-5.)

27    ///

28    ///

The relevant language on the outside stated in both English and Spanish:

**IMPORTANT INFORMATION. Read and understand before using.**

The inside of the booklet contained the following language in English and Spanish:

Limitation of Warranty and Liability Use Restriction

**READ THIS BEFORE OPENING or USING**

Harris Moran Seed Company (HM) warrants the seed and associated products in this container (collectively the "Seed") were labeled at the time of sale by HM, and conform to the label description within recognized tolerances.

Disclaimer of Warranties: HM makes <u>NO</u> other warranty of any kind. **THIS EXPRESS WARRANTY EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION HEREON.** Harris Moran makes <u>NO</u> warranty this Seed is free of seed-borne diseases or free of genetically modified organisms. As permitted by law, Seed is sold "As Is".

**Acceptance of Terms: Any person who buys, receives, opens or uses this Seed (collectively the "User") thereby accepts and agrees to this Limitation of Warranty and Liability and User Restriction ("Agreement") between User and HM. If User did not purchase this Seed directly from HM, User agrees that HM is a third-party beneficiary and is entitled to enforce this Agreement as if it had been entered into between User and HM. User agrees to accept full responsibility for the performance of the Seed and crop. IF USER DOES NOT ACCEPT THESE TERMS, USER MUST RETURN THIS SEED IN THE UNOPENED CONTAINERS TO THE PLACE OF PURCHASE FOR A FULL REFUND WITHIN 30 DAYS OF RECEIPT**

User's **Exclusive Remedy** and HM's sole liability for any loss resulting from the ordering or use of the Seed is limited to a refund of the price paid for the Seed and will not include incidental, consequential, or exemplary damages, such as loss of yield or lost profits. User agrees that HM's refund of the price paid for the Seed will not cause this agreement to fail of its essential purpose.

Product data and ratings are based on averages of results from various test locations. They are a summary of past results and **not** a prediction of future performance. Your performance will vary depending on the actual

- 18 -

11cv2482

1
2
> environment, pathogen strain and management conditions in your field. Any technical advice is provided for your consideration only and without charge.
> ...

3
4
> This Agreement is the **Entire Agreement** between HM and User regarding these terms of sale. User has not relied upon any warranty, representation or use restriction except as specifically provided in this Agreement.

5

6   Baja Best did not read the LOL before using the seed. (Ybarguen Decl. ¶ 13.)

7   No one with Baja Best ever opened or read the LOL for the 2009 order, the early 2010

8   order, or the November 2010 order at issue in this case until after the 2011 harvest.

9   (*Id.*) Baja Best did not attempt to return any Harris Moran seed within 30 days or at

10   any later date. (Def.'s Opp'n 7.)

11   The parties do not dispute the effect of the terms of the LOL. Rather, the issue

12   before the Court is whether the LOL are enforceable against Baja Best. As explained

13   below, the Court finds the Exclusive Remedy provision limiting Harris Moran's

14   liability to the price of the seed is enforceable, but the warranty disclaimers are not.

15   **A. Attaching LOL to Seed Packets**

16   Baja Best contends that the LOL are unenforceable because they were not

17   provided to Baja Best until the seed was delivered. The Court disagrees.

18   *Burr v. Sherwin Williams* addresses the enforcement of disclaimers included on

19   a product label. 42 Cal. 2d 682, 693-94 (1954). In *Burr*, drums of insecticide with

20   labels containing disclaimers of warranties were delivered to the plaintiffs' agent. *Id.*

21   at 693. The court noted the requirement that "the buyer have knowledge, or be

22   chargeable with notice of the disclaimer before the bargain is complete" and that such

23   notice could "be conveyed to the buyer by means of printed notices on letterheads,

24   labels and the like." *Id.* at 693. The court then found the disclaimers placed on the

25   labels of insecticide drums were enforceable even when only the plaintiffs' agents, not

26   the plaintiffs, saw the drums. *Id.* at 693.

27   Here, the LOL were attached to the seed when Baja Best received it, much like

28   the labels affixed to drums. This was also not the first time Baja Best was provided the

LOL.  Baja Best received the same LOL with two prior seed orders in 2009 and 2010.
This provides further support for charging Baja Best with notice of the LOL and
undercuts Baja Best's assertion that the LOL were unilaterally imposed after the sale.
Each order specifically allowed Baja Best to return the unopened seed within 30 days
for a full refund if it did not agree to the terms.  Although it did not, Baja Best could
have avoided the objectionable terms by returning the seed.  *See Ariz. Cartridge
Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 421 F.3d 981, 984, 987 (9th Cir.
2001) (finding that consumers accepted terms and conditions provided only on the box
for an ink cartridge because the consumer could reject them before use).  Baja Best
cannot avoid enforcement of the LOL simply because it failed to read the terms.

   The cases Baja Best relies are do not compel a different conclusion.  In *Dorman
v. International Harvest* warranty disclaimers were found unenforceable, but the terms
were found unenforceable because the terms were not "set forth in large, bold print in
such a position as to compel notice" and lacked an adequate heading. 46 Cal. App. 3d
11, 19 (2d Dist. 1975).[9]  Here, Baja Best challenges Harris Moran's provision of the
LOL by attachment to the seed packets in a booklet that noted it contained
"**IMPORTANT INFORMATION**" and the user should "**Read and understand
before using**."   This notice is conspicuous, unlike the font size or headings in
*Dorman*.[10]  *Dorman* does state "that a warranty given to a buyer *after* he signs the
contract is *not* binding."  *Id.* at 19-20.  However, there was no contract signed in this
case.  Additionally, it is undisputed that Baja Best received the same LOL on two prior
orders, further charging it with notice of the terms by the third order at issue here.
///

---

[9]*Hauter v. Zogart* is similarly based on the absence of conspicuous language. 14
Cal. 3d 104, 118-120 (1975).  In *Hauter*, there was no language at all, but rather the
defendant argued that a drawing depicting proper use of the Golfing Gizmo implied a
limitation that it was only safe when used correctly.  *Id.* at 118.

[10]Baja Best makes one passing reference to "legalese" in its Opposition to Harris
Moran's motion for summary judgment, but Baja Best provides no discussion or
analysis challenging the content or format of the LOL.  (Pl.'s Opp'n 21.)

1    *Klein v. Asgrow Seed Co.* comes closer to the facts of this case, although it does

2    not analyze the primary challenge Baja Best raises here. 246 Cal. App. 2d 87 (3d Dist.

3    1966). Disclaimers provided to buyers after the sale of tomato seeds were found

4    unenforceable. *Id.* at 97. However, the decision was based in large part on the use of

5    small print that was intended to go unnoticed. *Id.* Here, as noted above, the exterior

6    of the booklet alerted the user it contained important information and directed the user

7    to read the contents before use. As to the provision of the terms on delivery, the court

8    did give weight to the provision of the disclaimers after the sale, but the court found

9    the buyers did not "have, or become charged with, knowledge of such nonwarranty

10   when the sale was made." *Id.* This is significant because, as noted above under *Burr*,

11   plaintiffs were charged with knowledge of the terms included on labels attached to

12   drums provided to the plaintiffs' agents. 42 Cal. 2d at 693. Additionally, as noted

13   above, Baja Best received the LOL for two prior seed orders.

14   Provision of the LOL though attachment to the seed packets does not render the

15   LOL unenforceable when Baja Best received prior orders that included the same terms.

16   **B. Unconscionability**

17   The LOL are not unconscionable. "[T]he core concern of the unconscionability

18   doctrine is the absence of meaningful choice on the part of one of the parties together

19   with contract terms which are unreasonably favorable to the other party." *Sonic-*

20   *Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013) (internal quotation marks

21   omitted). "[U]nconscionability has both a procedural and a substantive element."

22   *Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (quoting

23   *A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486-87 (4th Dist. 1982)).

24   Terms are only unenforceable based on unconscionability if the terms are "both

25   procedurally and substantively unconscionable." *Shroyer v. New Cingular Wireless*

26   *Servs.*, 498 F.3d 976, 981 (9th Cir. 2007) (citing *Nagrampa v. Mailcoups, Inc.*, 469

27   F.3d 1257, 1280 (9th Cir. 2006) (en banc)). The terms at issue here are not

28   procedurally or substantively unconscionable.

### 1. Procedural Unconscionability

"The procedural element focuses on two factors: oppression and surprise." *A&M Produce Co.*, 135 Cal. App. 3d at 486. "'Oppression' arises from an inequality of bargaining power which results in no real negotiation and the absence of meaningful choice." *Nunes Turfgrass, Inc. v. Vaugan-Jacklin Seed Co.*, 200 Cal. App. 3d 1518, 1534 (5th Dist. 1988). "'Surprise' involves the extent to which the terms of the bargain are hidden in prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.*

The Court finds no oppression. Although Harris Moran is a larger company than Baja Best in terms of annual sales revenue, two billion versus twenty million, this does not establish an unequal bargaining position. Additionally, Baja Best had other options for seed and explored its options before selecting the particular varieties of Harris Moran seed that it did. Ybargen indicates that the Harris Moran seed was considerably more expensive than other options which itself suggests some meaningful choice in seed. (Ybarguen Decl. ¶ 5.) Baja Best also conducted seed trials with other companies' seed and had the freedom to select those it believed would produce the best results. (Ybarguen Dep. 82:4-25; Soto Dep. 62:8-63:4, 66:10-67:22, 68:11-69:3.)

Baja Best does not directly address surprise in its analysis of procedural unconscionability. However, the Court finds there was no surprise. As discussed above, this was the third order of seed Baja Best received with these terms, the exterior of the booklet alerted the user that it contained "**IMPORTANT INFORMATION**" and directed the user to "**read it before use.**" Baja Best cannot claim it was surprised by the terms because it ignored this guidance.

### 2. Substantive Unconscionability

Terms are substantively unconscionable if the terms "shock the conscience" or are "unreasonably one-sided." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1159-60 (2013) (acknowledging both standards have been utilized by lower courts to evaluate substantive unconscionability and finding either standard may apply). Even

terms that appear one-sided may not be substantively unconscionable if there is justification for it. *A&M Produce Co.*, 135 Cal. App. 3d at 487. Put another way, a "term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected way." *Id.*

Baja Best argues that a refund of the purchase price is insufficient because the grower spends money to bring a crop to a successful harvest, only to have it fail because of a defective seed.[11]  Harris Moran argues that the limitation is reasonable because a seed seller cannot predict or control many other factors affecting the success of a crop, including the grower's protocols and precautions and the time, effort, and materials the grower invests in the crop.

The Court is mindful that a grower makes a significant investment in the success of a crop, but there is justification for reallocating the risk of a crop's failure on the grower, given the many factors that are beyond the seller's control. This might be a bad bargain for Baja Best or even one-sided in favor of Harris Moran, but that is not sufficient to establish substantive unconscionability. Rather the Court must find the terms "shock the conscience" or are at least "unreasonably one-sided." *Sonic-Calabasas A,* 57 Cal. 4th at 1159-60 (noting the two available standards and additionally finding "unconscionability requires a substantial degree of unfairness beyond a simple old fashioned bad bargain"). The LOL are not substantively unconscionable.

**C. Public Policy**

In moving for summary judgment, Baja Best argues the LOL are void because the terms violate public policy. Baja Best asserts that Harris Moran's seed advertisements were false because the advertisements represented the seed to have a

---

[11]Although not necessary for the analysis, the Court notes that the practice of limiting liability to the price of the seed was acknowledged by a California appeals court in 1988. *Nunes Turfgrass*, 200 Cal. App. 3d at 1533. ("The custom of nonwarranty or limiting the buyer's recovery to the purchase price of the seed has prevailed in the seed industry for many years").

level of resistance to TSWV that the seed did not have.  If proven, Baja Best argues this conduct would violate California Food and Agriculture Code § 52482 and the Federal Seed Act, 15 U.S.C. § 1571 *et seq*, prohibitions on false advertising.  Baja Best does not assert claims for violation of either of these statutes, but rather, relies on California Civil Code § 1668.  Section 1668 prohibits a party from "contract[ing] away liability for fraudulent or intentional acts or for *negligent violations of statutory law*."[12]  *Nunes Turfgrass*, 200 Cal. App. 3d at 1538 (emphasis added).

As to the Exclusive Remedy provision in the LOL, *Nunes Turfgrass v. Vaughan-Jacklin Seed*, is factually similar to this case and directly analyzes whether a party can limit its damages for a statutory violation.  *Id.* at 1523 (analyzing a violation of California Food and Agriculture Code § 52482).  The court specifically noted § 1668's prohibition, but upheld a provision limiting liability to the purchase price because another statute, California Uniform Commercial Code § 2719, specifically authorizes limitations on damages for commercial loss unless the limitation is unconscionable.  *Id.* at 1534.  The court found that § 2719 prevailed over § 1668 because it is the more specific statute.  *Id.* at 1539 ("The special act will be considered as an exception to the general statute whether it was passed before or after such general enactment").

Baja Best ask the Court not to follow *Nunes* and instead follow the analysis in *Klein v. Asgrow Seed Co.*  246 Cal. App. 2d at 99-102.  The Court declines to do so for two reasons.  First, the *Nunes* court accurately found the *Klein* court's analysis of this issue was dicta.  *Nunes Turfgrass*, 200 Cal. App. 3d at 1539.  Having already found there was no agreement to limit liability, the court went on to note that the newly adopted Commercial Code would not extend a seller's ability to limit its liability, but first noted "the Commercial Code is inapplicable to these sales."  *Klein*, 246 Cal. App. 2d at 102.  Second, the *Klein* court did not analyze § 2719.  *Id.* 102.  The court makes

---

[12]Section 1668 provides that "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against public policy."

only a general reference to the Commercial Code. *Id.*

Following the *Nunes Turfgrass* analysis, the Court finds the Exclusive Remedy provision is enforceable and Baja Best's damages are limited to the purchase price of the seed.

A similar analysis would appear to apply to the warranty disclaimers in the LOL. Baja Best argues the warranty disclaimers would violate § 1668's prohibition on contracting away liability for statutory violations, but California Uniform Commercial Code § 2316 specifically provides for the exclusion or modification of warranties. *See Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 26 (4th Dist. 1989) (citing § 2316 and noting that "[w]arranty disclaimers . . . are specifically authorized by the California Uniform Commercial Code"). However, Harris Moran did not raise § 2316 in addressing Baja Best's public policy argument.[13]  Rather, Harris Moran simply notes in its Reply brief that the public policy argument would "only reach[] the warranty disclaimers, not the Exclusive Remedy Clause." (Def. Reply 8.) Although it appears to the Court at first glance that the warranty disclaimers are enforceable, neither party has carried its burden on summary judgment on this issue.

Baja Best's motion for summary judgment seeking a determination that the LOL are unenforceable is **DENIED**.  Harris Moran's motion for summary judgment seeking a determination that the LOL are enforceable is **GRANTED** as to the Exclusive Remedy provision and **DENIED** as to the warranty disclaimers in the LOL.

## V.    Harris Moran's Affirmative Defenses

Baja Best moves for summary judgment on Harris Moran's affirmative defenses for waiver, estoppel, laches, unclean hands, and the statute of frauds.  As to each defense, Baja Best, as a moving party "on an issue on which [Harris Moran] bears the burden of proof," has met its burden by "pointing out . . . that there is an absence of evidence to support" Harris Moran's defenses. *Celotex*, 477 U.S. at 325.  Harris Moran

---

[13]Harris Moran notes § 2316 in other areas of analysis, but does not raise it directly with regard to Baja Best's argument that the LOL violate public policy.

has met its burden to show that there is a genuine issue for trial on its waiver defense, but has not met its burden on the estoppel, laches, unclean hands, and statute of frauds defenses. *Horphag Research Ltd.,* 475 F.3d at 1035. The Court notes that Harris Moran has simply recited minimal facts as to groups of defenses without explanation how those facts support any defense and without citation to any authority. However, the Court has analyzed each and rules as follows.

### A. Estoppel and Waiver[14]

Harris Moran points to: (1) Baja Best's use of the seed even though the LOL warned the user that the seed must be returned if the user did not accept the terms and (2) Baja Best's heat treatment of some of the seed as facts supporting its waiver and estoppel defenses.

Waiver requires (1) "an existing right, benefit, or advantage," (2) "knowledge, actual or constructive, of [the right's] existence," and (3) "an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that it has been relinquished." *State of Wash. ex rel. Burton v. Leyser*, 196 Cal. App. 3d 451, 460 (5th Dist. 1987) (quoting *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 41 (3d Dist. 1975)). Looking to the facts asserted by Harris Moran the "existing right, benefit, or advantage" that Baja Best had knowledge of could be Baja Best's rights to recover for the crop loss. Using the seed, despite the option to return it and the warning that use of the seed constituted acceptance of the LOL, could be "conduct so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that [the right] has been relinquished." Harris Moran has identified facts sufficient to survive summary judgment on its waiver defense.

"The essential ingredients of an estoppel are (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so

---

[14]The Court groups the defenses as Harris Moran did because the facts identified were associated with multiple defenses.

11cv2482

act that the other party has a right to believe that it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) *the other party must rely on the conduct to her injury*." *Moore v. State Bd. of Control*, 112 Cal. App. 4th 371, 384 (3d Dist. 2003) (emphasis added) (citing *Longshore v. Cnty. of Ventura* 25 Cal. 3d 14, 28 (1979)). Harris Moran fails to explain how the facts it identifies support each of these elements and cites no authority recognizing estoppel based on similar facts. Particularly absent are any facts suggesting Harris Moran suffered any injury as a result of reliance as required to meet the fourth element.

Baja Best's motion for summary judgment is **DENIED** as to Harris Moran's affirmative defense for waiver and **GRANTED** as to Harris Moran's affirmative defense for estoppel.

### B. Unclean Hands and Laches

Harris Moran points to the eventual exclusion of Machado and other Semillas personnel from Baja Best's farm shortly before the harvest and a six-month delay in bringing this action as facts supporting its laches and unclean hands defenses. Harris Moran argues the exclusion from the farm resulted in Baja Best's exclusive control over documentation of the crop failure. Baja Best initially allowed Semillas personnel access to the farm for approximately four months to provide assistance in determining why the crop was failing and what Baja Best might do to salvage the harvest, but Baja Best eventually excluded them because they failed to provide any useful guidance or the results of testing that had allegedly been done.

"The unclean hands doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy." *Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 58 (4th Dist. 2007); *see also Ellenburg v. Brockway*, 763 F.2d 1091, 1097 (9th Cir. 1985) ("The unclean hands doctrine derives from the equitable maxim that he who comes into equity must come with clean hands"). "The defense is available in legal as well as equitable actions." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (5th Dist. 1999). The doctrine requires "unconscionable, bad faith,

1   or inequitable conduct by the plaintiff in the matter in controversy." *Fladeboe*, 150

2   Cal. App. 4th at 58.  No jury could reasonably find Baja Best's exclusion of Semillas

3   personnel from its farm was unconscionable, inequitable, or done in bad faith,

4   particularly when Harris Moran has failed to identify any evidence indicating the

5   exclusion has had any impact on the issues presented in this case. *Kendall-Jackson*

6   *Winery*, Ltd., 76 Cal. App. 4th at 979 ("The misconduct that brings the clean hands

7   doctrine into play must relate directly to the cause at issue").

8        The laches doctrine is codified in California Civil Code § 3527 and provides that

9   "'[t]he law helps the vigilant, before those who sleep on their rights." The defense

10  "requires unreasonable delay in bringing suit plus either acquiescence in the act about

11  which the plaintiff complains or prejudice to the defendant resulting from the delay."

12  *Miller v. Eisenhower Med. Ctr.*, 27 Cal. 3d 614, 624 (1980).  Prejudice "must be

13  affirmatively demonstrated by the defendant in order to sustain his burdens of proof

14  and the production of evidence on the issue." *Id.*  Even if the Court assume a six-

15  month delay in filing suit could give rise to a laches defense, a proposition for which

16  Harris Moran cites no authority, the defense still fails because Harris Moran has not put

17  forth any evidence, or even explained how the six-month "delay" was prejudicial to

18  Harris Moran.

19       Baja Best's motion for summary judgment is **GRANTED** as to Harris Moran's

20  affirmative defenses for laches and unclean hands.

21       **C. Statute of Frauds**

22       The statute of frauds provides that "a contract for the sale of goods for the price

23  of five hundred dollars ($500) or more is not enforceable by way of action or defense

24  unless there is some writing sufficient to indicate that a contract for sale has been made

25  between the parties and signed by the party against whom enforcement is sought or by

26  his or her authorized agent or broker."  Cal. Com. Code § 2201(1).  However, the

27  statute of frauds does not apply "[w]ith respect to goods for which payment has been

28  made and accepted or which have been received and accepted."  Cal. Com. Code. §

2201(3)(c); *see also Andrew Smith Co. v. Paul's Pak, Inc.*, 754 F. Supp. 2d 1120, 1129 (N.D. Cal. 2010) (allowing a plaintiff to pursue damages for lettuce received and accepted despite the lack of a signed writing based on § 2201(3)(c)). There is no dispute that payment was accepted and the seed was received and accepted. Because the statute of frauds does not apply, it cannot be asserted as a defense. Baja Best's motion for summary judgment on Harris Moran's statute of frauds affirmative defense is **GRANTED**.

## CONCLUSION

Baja Best's claims for Negligent Misrepresentation and Fraud are **DISMISSED** as requested by Baja Best. Baja Best's motion for summary judgment is **DENIED** as to agency, the LOL, and Harris Moran's waiver defense. Baja Best's motion for summary judgment is **GRANTED** as to Harris Moran's defenses for estoppel, unclean hands, laches, and the statute of frauds. Harris Moran's motion for summary judgment is **DENIED** as to the breach of contract and warranty claims and the warranty disclaimers of the LOL. Harris Moran's motion for summary judgment is **GRANTED** as to the negligence and products liability claims and the Exclusive Remedy provision of the LOL.

**IT IS SO ORDERED.**

DATED:  September 3, 2014

Hon. Roger T. Benitez
United States District Judge

11cv2482